FILED

2012 Sep-04  PM 10:42
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHER DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **MORGAN KEEGAN & COMPANY, INC.,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | **2:12-cv-02612-RDP** |
| **MUNICIPAL WORKERS** | ) | |
| **COMPENSATION FUND, INC.,** | ) | **ORAL ARGUMENT REQUESTED** |
| | ) | |
| **Respondent.** | ) | **OPPOSED** |

---

**MOVANT MUNICIPAL WORKERS COMPENSATION FUND'S INITIAL BRIEF
IN SUPPORT OF ITS MOTION TO VACATE
IN RESPONSE TO EXHIBIT B OF THE COURT'S ORDER**

SUBMITTED BY:

Page A. Poerschke
Laura S. Dunning
Rebecca A. Beers
**HASKELL SLAUGHTER YOUNG
& REDIKER, LLC**
2001 Park Place, Suite 1400
Birmingham, AL 35203
pap@hsy.com
lsd@hsy.com
rb@hsy.com

Peter J. Mougey
**LEVIN PAPANTONIO THOMAS
MITCHELL RAFFERTY & PROCTOR,
P.A.**
316 South Baylen Street, Suite 600
Pensacola, FL 32502-5996
pmougey@levinlaw.com

## TABLE OF CONTENTS

**Page**

Introduction ….. …………………………………………………………………………1

FACTUAL AND PROCEDURAL BACKGROUND………………………………………....3

A.      MWCF Initiates Arbitration against MK and MAM……………………………….3

B.      Arbitrator Selection Process……………………………………………………….4

      1.      Arbitrator Disclosure is the Cornerstone of FINRA Arbitration…………………4

      2.      Selection of the MWCF Panel …………………………………………………....6

C.      The Arbitration Hearing and Award………………………………………………...7

D.      After the Hearing, MWCF Learns that Julavits and Kunis Failed to Disclose Highly Material Information………………………………………………………………..8

      1.      Julavits Failed to Make the Required Disclosure of Claims Filed Against Him Which Were Substantially Similar to the Claims Asserted in the Underlying Arbitration………………………………………………………………………8

      2.      Kunis Failed to Make the Required Disclosure of His Firm's Involvement with MK and its Counsel………………………………………………………………...10

            a.      Kunis did not disclose that Maxim and MK regularly act as co-underwriters………………………………………………………………...12

            b.      Kunis did not disclose that Maxim and MK were co-defendants……….12

            c.      Kunis Failed to Make the Required Disclosure of His Firm's Representation by Opposing Counsel………………………………….12

            d.      Kunis Failed to Make the Required Disclosure of His Firm's Involvement with the Products at Issue…………………………………………..…13

ARGUMENT………………………………………………………………………………15

A.      Julavits and Kunis Failed to Make Required Disclosures of Facts that Could Cause a Person to Reasonably Entertain a Doubt about their Impartiality, Requiring Vacatur. …………………………………………………………………………………15

      1.      Arbitrators Have a Duty to Disclose to the Parties ……………………...15

2.    Julavits' Failure to Disclose Prior Litigation as Defendant Requires Vacatur of the Award…………………………………………………………………………..19

3.    Kunis' Firm's Extensive Relationships to the Parties and Their Counsel, as well as His Firm's Involvement with the Products at Issue in the Underlying Arbitration, Warrant Vacatur………………………………………………………………………22

4.    The Failures to Disclose Deprived MWCF of its Preemptory Strikes…………...24

5.    MWCF Had No Duty to Investigate the Truthfulness of the Disclosures……….25

CONCLUSION …………………………………………………………………………25

Pursuant to Section 10 of the Federal Arbitration Act ("FAA"), Cross-Petitioner the Alabama Municipal Workers Compensation Fund ("MWCF") moves to vacate the arbitration award (the "Award") issued in *Municipal Workers Compensation Fund v. Morgan Keegan & Co., Inc and Morgan Asset Management*, FINRA Case No. 09-0312, and states as follows:[1]

## INTRODUCTION

The Municipal Workers Compensation Fund, Inc., ("MWCF") is a non-profit corporation which administers a self–insured group workers compensation fund for the benefit of MWCF's members, more than 550 municipalities and governmental organizations in the State of Alabama. MWCF's investable assets consist entirely of public funds and exist solely for the benefit of the public. Declaration of Page Poerschke ("Decl.") ¶¶ 3, 50 and 51.  After solicitation by Morgan Keegan ("MK") and Morgan Asset Management ("MAM")[2], MWCF entrusted management and investment of its assets, which were to fund worker's compensation insurance for Alabama public employees, to MK and MAM. *Id.*, ¶ (SOC, Pre Hearing Brief, Post Hearing Brief). MK and MAM abused that trust and breached their fiduciary duties to MWCF by ignoring MWCF's mandated investment objectives, and instead nearly 100% of MWCF's approximate $50 million supposed "diversified," "conservative," and "low risk" fixed income portfolio, in an "alternative" strategy concentrated in esoteric credit-tranched, asset backed, structured finance products, which MK itself described as a "sub-sub sector" of the fixed income market. *Id.*

---

[1] MWCF has previously filed a Motion to Dismiss the Petition to Confirm filed by MK.  MWCF files this Motion to Vacate in preservation of its right to move to vacate, and does not waive, but expressly reserves, the jurisdictional arguments presented in its Motion to Dismiss.  While MWCF believes that this Court lacks jurisdiction to hear this matter due to the fact that MK has failed to join an indispensable party, MAM, joinder of whom would destroy diversity jurisdiction, MWCF has filed this Motion to Vacate in an abundance of caution, despite the fact that under 9 U.S.C. § 12, MWCF has three months after the date of the award within which to file such a motion, so that its grounds for vacatur will be preserved should the Court determine it has jurisdiction. MWCF reserves the right to amend and to supplement the instant Motion to move to vacate the Award as to MAM should this Court deny MWCF's rule 12(b)(7) motion to dismiss..

[2] MAM has not filed a Motion to Confirm the Award. MWCF has filed a notice of appeal with the intention of filing a motion to vacate the arbitration award under Alabama Rule of Civil Procedure 59 as to both MK and MAM in the Jefferson County Circuit Court, which properly has jurisdiction over all parties and the subject matter.

In the Arbitration, the chairperson failed to disclose that he was the defendant in <u>five lawsuits</u> alleging the same claims MWCF alleged against MK and MAM, and affirmatively misrepresented that no such litigation existed.  The non-public arbitrator also failed to disclose his firm's relationship with MK and MK's counsel, and its involvement in underwriting the types of securities that were the subject of MWCF's claims, including certain ones owned by MWCF.

The Award should thus be vacated under Section 10(a)(2) because there was "evident partiality" on the part of the both the panel chairperson and the non-public (industry) arbitrator. *See* 9 U.S.C. § 10(a)(2) (authorizing district court to vacate arbitration award "where there was evident partiality ... in the arbitrators"). Evident partiality exists when an "arbitrator knows of, but fails to, disclose information that would lead a reasonable person to believe that a potential conflict exists" or would "create a reasonable impression of partiality." *Univ. Commons-Urbana, Ltd. v. Universal Constructors Inc*., 304 F. 3d 1331, 1339 (11th Cir. 2002).  Here, two panelists failed to disclose facts that reasonably would create an appearance of partiality or bias. Disclosure of this information was required by FINRA Rules and is essential to ensure that parties' arbitration hearing that is free from bias, corruption, and the appearance of impropriety.

In addition, the conduct described below also falls under two additional subsections of Section 10(a) of the FAA and constitutes additional grounds upon which vacatur is appropriate. First, the arbitrators' failure to disclose the important information discussed herein resulted in the Award being "procured by corruption, fraud, or undue means," 9 U.S.C. § 10(a)(1), mandating vacatur. In addition, this failure to disclose also indicates that the arbitrators "were guilty of . . . other misbehavior by which the rights of [MWCF] have been prejudiced." 9 U.S.C. § 10(a)(3). Based upon a review of the facts in the arbitration below and upon the applicable provisions of the FAA, it is clear that vacatur is warranted here.

## FACTUAL AND PROCEDURAL BACKGROUND

**A.      MWCF Initiates Arbitration against MK and MAM.**

MWCF had investments in the RMK Funds, a series of mutual funds created, managed and sold by MAM and MK, and in a separately managed account run on a fiduciary and discretionary basis by MK and MAM employee, Jim Kelsoe ("Kelsoe"). Decl. ¶¶ 3, 50 and 51. In 2007, the RMK Funds spectacularly collapsed, losing 62% on average in 2007 while their peers had positive returns or only modest losses.  Decl. ¶¶ 50 and 32.  The RMK Funds' failure spurred investigations by various regulators, including the SEC, FINRA and the Alabama Securities Commission.  *Id.*  Among the regulators' findings were that MK and MAM failed to disclose the RMK Funds' risks adequately and instead marketed them as low risk, stable and liquid and that MAM and Kelsoe essentially defrauded clients and prospective clients. *Id*. The regulators imposed harsh sanctions on MK, MAM and Kelsoe, including millions of dollars in fines and heavy restrictions on their activities, and barred Kelsoe from the securities industry for life.  *Id.* Kelsoe also invested MWCF's fixed income account directly in many of the same securities held by the RMK Funds.  *Id.*

The investments at issue were entirely recommended by MK and MAM, who managed MWCF's investments in accordance with strict contractual fiduciary duties. Decl. ¶¶ 3, 32, 50 and 51. MK and MAM managed the majority of these public funds on an entirely discretionary basis. *Id*. Instead of constructing a diversified fixed income portfolio, as they represented, MK and MAM concentrated MWCF's portfolio in a sub-sub- sector of the fixed income market which was subject to extraordinary risks and highly unsuitable for MWCF. *Id.*  These risks were never identified to the MWCF, but were routinely masked via material misrepresentations and omissions, which constituted breaches of MK and MAM's fiduciary duties to MWCF. *Id.* As a

result of MK and MAM's actions and omissions, MWCF suffered principal losses in excess of $31,000,000. While a portion of these losses arose from investments in the RMK Funds, the vast majority of MWCF's losses arose from investments in individual credit tranched structured finance holdings selected and purchased for its fixed income portfolio by MAM and MK on a discretionary basis. *Id.*

On May 28, 2009, MWCF initiated arbitration against MK and MAM in FINRA arbitration. Decl. ¶ 3. In the underlying arbitration MWCF alleged, *inter alia*, breach of fiduciary duty and fraudulent and/or negligent misrepresentation. *Id. See also* Decl. ¶¶ 50 and 51. Indeed, these allegations were the gravamen of MWCF's Statement of Claim. Decl. ¶ 3

**B.**     **Arbitrator Selection Process.**

    **1.**     **Arbitrator Disclosure is the Cornerstone of FINRA Arbitration**

The importance of arbitrator disclosures to the FINRA arbitration process cannot be overstated. As described in the FINRA Arbitrator Guide (Decl. ¶ 15, Ex. 28 at p. 16. *See also*, Decl. ¶ 26):

> **Arbitrator disclosure is the cornerstone of FINRA arbitration**, and the arbitrator's duty to disclose is **continuous and imperative**. Disclosure includes **any relationship, experience and background** information that **may affect—or even appear to affect**—the arbitrator's ability to be impartial and the parties' belief that the arbitrator will be able to render a fair decision. When making disclosures, **arbitrators should consider all aspects of their professional and personal lives** and **disclose all ties between the arbitrator, the parties and the matter in dispute, no matter how remote they may seem**. If you need to think about whether a disclosure is appropriate, then it is: **make the disclosure**.

To that end, FINRA Rule 12405 (Decl. ¶ 27) requires (in part):

> (a) . . . . Each potential arbitrator must make a reasonable effort to learn of, and must disclose to the Director, any circumstances which might preclude the arbitrator from rendering an objective and impartial determination in the proceeding, including:
>
>     (1) Any direct or indirect financial or personal interest in the outcome of the

arbitration;

(2) Any existing or past financial, business, professional, family, social, or other relationships or circumstances with any party, any party's representative, or anyone who the arbitrator is told may be a witness in the proceeding, that are likely to affect impartiality or might reasonably create an appearance of partiality or bias

FINRA's disclosure rules are designed to provide the parties with an honest adjudicatory process and "FINRA strongly encourages arbitrators to make a wide variety of disclosures," because meeting that disclosure requirement is part of an "arbitrator's overarching duty...to preserve the integrity and fairness of the arbitral process."  Decl. ¶ 26.  FINRA facilitates the disclosure process from the beginning of an arbitrator's potential service in the FINRA Arbitrator Application (Decl. ¶ 27), to detailed disclosure in the Arbitrator Disclosure Report that is given to the parties, to ongoing disclosure in the Disclosure Checklist. The Arbitrator Disclosure Report is compiled by FINRA after the parties are required to "submit biographical information on an arbitration profile form to [FINRA]" which is then "sent to parties [in the form of the Arbitrator Disclosure Report] to use in the arbitrator selection process, such as determining whether to challenge arbitrators."  Decl. ¶¶ 27 and 30.  As explained in the FINRA Arbitrator Manual, which each Arbitrator is bound to follow, "[i]t is extremely important that the profile be completed accurately and updated periodically." These are all tools that, together with ongoing arbitrator education from FINRA's *Neutral Corner* publication, help to ensure the arbitrators known the importance of full disclosure and have ample opportunity to implement it.  *Id.*

The parties rely on the disclosure process and depend on the information contained in the Disclosure Reports to rank or strike arbitrators to form the panel of three who ultimately hear the case, as well as to determine whether they have any additional strikes for cause or grounds to request a panel members' removal once they are ultimately assigned.  Once selected by the

parties, FINRA provides the arbitrators with case information, including the names of the parties and the parties' lawyers, a description of the nature of the case, the statement of claim and the answer, disclosures of the other arbitrators assigned to the matter, and witness lists. Decl. ¶ 25, Ex. 28 at p. 16. The arbitrators have the obligation to perform conflicts checks, complete related FINRA Disclosure Checklists, and read the statement of claim and answer. *Id.*

        2.        **Selection of the MWCF Panel**

The parties all submitted "Uniform Submission Agreements" as part of the initial pleading process in the arbitration proceeding. Decl. ¶ 4.  The Uniform Submission Agreements signed by MK and separately by MAM specifically state that "[t]he undersigned parties further agree and understand that the arbitration will be conducted in accordance with the Constitution, By-Laws, Rules, Regulations, and/or Code of Arbitration Procedure of the sponsoring organization" all of which required certain arbitrator disclosures be made to the parties.  Decl. ¶ 4. Those disclosures were not fully made in this case.

As required by FINRA's Code of Arbitration Procedure, on November 16, 2009, FINRA provided a list of thirty proposed arbitrators to the parties, from which they were to select a panel by a system of "ranks" and "strikes." Decl. ¶ 5. The list of thirty proposed arbitrators was accompanied by their affirmative initial disclosures, on which the parties must rely to make their selections because FINRA arbitration does not provide for a voir dire process that is akin to selecting a jury from a venire.  *Id.*  After the parties submitted their ranks and strikes to FINRA, FINRA appointed a panel of three arbitrators: a public chairperson, a public panelist, and a non-public (securities industry) panelist. Over the course of the next two and a half years, the composition of the panel changed several times, often as the result of new information revealed about the panelists as a result of their continuing disclosure requirements. Decl. ¶¶ 5-23.

Ultimately, the parties received disclosures about, and completed the rank and strike process for, sixty-six (66) potential arbitrators before the final panel of three was appointed.  The final panel consisted of William Julavits ("Julavits") (chairperson), Patricia DeWitt ("DeWitt") (public panelist) and Eric Kunis ("Kunis") (non-public/securities industry panelist), all of whom were appointed within three months of the start of the final hearing.  Decl. ¶¶ 17, 22 and 23.

Because Kunis and DeWitt responded in the negative to all items on their Disclosure Checklists, the parties never received any additional disclosures regarding Kunis and DeWitt beyond their initial disclosures. Decl. ¶ 53. However, on March 26, 2012, the parties received from FINRA additional disclosures in the form of a Disclosure Checklist regarding Julavits. Decl. ¶ 21. Included therein was Question 11, set out below, which falls within the checklist section entitled "Subject Matter Disclosures," under the heading: "In this series of questions, we are seeking Information about any experience (specific or general) you may have/had with the subject matter of the arbitration."  *Id.*  Question 11(A) specifically inquires:" Have you, your spouse, or an immediate family member been involved in a dispute involving the same or similar subject matter as the arbitration?" Julavits answered "No."  In addition, Question 11(B) asked: Did the dispute assert any of the same allegations as the assigned arbitration, even if the dispute was not securities-related?" Julavits responded by indicating "NA" to this question.  *Id.*  Both of these responses were false and misleading, based on information known to Julvaits at that time.

## C.      The Arbitration Hearing and Award

The arbitration hearing lasted nearly three weeks. Decl. ¶ 31, Ex. 34.   At no time during the hearing did any of the arbitrators, including Julavits and Kunis, make any further disclosures. In fact, both certified that they had no additional disclosures to make.  Decl. ¶ 32, Ex. 34 at pp. 1-13.   It was only on that basis that MWCF accepted them as the panel.  *Id.*

On August 1, 2012, the panel issued its Award. Decl. ¶ 31.  The Award, authored by Julavits pursuant to FINRA rules, incorrectly stated that all of MWCF's causes of action relate to its investments in the RMK funds and then dismissed MWCF's claims.[3]

**D.      After the Hearing, MWCF Learns that Julavits and Kunis Failed to Disclose Highly Material Information**

Because of Julavits and Kunis' deficient arbitrator disclosures, MWCF did not learn until after the arbitration hearing that both panelists were subject to material conflicts and biases which likely prejudiced their determination of MWCF's claims and, at the least, create a reasonable impression of bias.  Had these circumstances and relationships been properly disclosed, as they were required to be, MWCF would not have agreed to accept either panelist.

**1.      Julavits Failed to Make the Required Disclosure of Claims Filed Against Him Which Were Substantially Similar to the Claims Asserted in the Underlying Arbitration**

Julavits failed to disclose, either in his initial disclosures, additional disclosures, or at the time of hearing, that he was a <u>defendant</u> in <u>five cases</u> that are highly relevant here. Julavits was named as a third party defendant in five separate actions filed in the fall of 2011 in Beaufort County, South Carolina, seeking to recover damages for the devaluation and decreased marketability of real property and equity interests.  Decl. ¶ 33.  In those actions, the third party plaintiffs asserted tort claims including breach of fiduciary duty, misrepresentation, negligence and fraud against Julavits, just as the MWCF did in the arbitration against MK and MAM.  *Id.*

The South Carolina claims sought recovery of damages against Julavits in his capacity as a director of the Callawassie Island Members Club ("CIMC").  Certain members of the CIMC ("Members") asserted claims against the CIMC board members based upon theories of

---

[3] Based on the Award, it appears that the Panel considered only MWCF's claims based on the RMK Funds, and did not consider the majority of MWCF's claims, which were based on other investments selected by MK and MAM for its fixed income portfolio.  Accordingly, the Award is so indefinite as to be unenforceable.

misrepresentation and breach of fiduciary duty. *Id.*  The Members contended that the CIMC, in part through its board members, made various false statements to them concerning the value of property at Callawassie, the value of their equity interests in certain club memberships, and the market for, transferability of and termination of said equity interests, as well as other allegedly false statements. *Id.* The Members further contended that the board members owed fiduciary duties to them, and that Julavits and the other directors violated their fiduciary obligations. *Id.* Specifically, the Members alleged that the CIMC was an "equity" club and that the Board of Directors was in a "special relationship of trust and confidence" with the Members.  *Id.*  The Members further alleged:

> The Third Party Defendants, as a result of this relationship, owed the [Members] fiduciary duties, including the duties of care, loyalty, and good faith, with regard to the interests of the [Members] and could not therefore act in their own best interest without regard for their duties to the [Members].

*Id.*  The Members asserted that the misrepresentations and breaches of fiduciary duties by Julavits and other directors caused "the value of the [Member's] membership(s) to be greatly or significantly diminished by its actions and inactions."  *Id.*  <u>Four of these actions were still pending when the MWCF arbitration was set to begin.</u>  *Id.* The actions were dismissed in the Spring/Summer of 2012 for lack of specificity as to the claims against Julavits and the individual directors, but the dismissal orders specifically allowed the Members to amend to include specific allegations against individual board members. *Id.*

The allegations made against Julavits in the five South Carolina cases are strikingly similar to the allegations that MWCF made against MK and MAM in the underlying arbitration. Like the Members, MWCF alleged that MK and MAM made material misrepresentations regarding the securities in MWCF's accounts, that MK and MAM owed it fiduciary duties, that MK and MAM breached those duties, and that those misrepresentations and breaches of

fiduciary duties caused MWCF to suffer investment losses in the accounts managed by MK and MAM. Decl. ¶¶ 3, 51 and 52.  In complete and utter disregard for the FINRA Rules, Julavits not only <u>never disclosed his involvement</u> <u>in this recent similar litigation</u> to the parties, which was unquestionably required to be disclosed in the Arbitrator Checklist, but when specifically asked whether he had ever been involved in litigation with the same subject matter, <u>Julavits affirmatively represented that he had not</u>.  Decl. ¶ 21.  He then indicated that a question asking whether he had been involved in suit with "similar allegations . . . even if not securities related" was "N/A" - not applicable.  *Id.*  The decision to affirmatively conceal these material legal actions involving identical claims can only be intentional. Julavits' prior undisclosed litigation experience, as a recent defendant in a lawsuit where he was the subject of the same claims, would lead a reasonable person to believe that a potential conflict exists.

### 2.    Kunis Failed to Make the Required Disclosure of His Firm's Involvement with MK and its Counsel

Unknown to MWCF at the time of the arbitration hearing, and undisclosed by Kunis at any time, Kunis's firm had a close, on-going and material relationship with MK and its counsel which was required to be disclosed. Kunis is an officer/director of the financial services firm Maxim Group, LLC, ("Maxim Group") and has been a vice president of and partner in that firm since 2002. Decl. ¶¶ 22 and 39.  Maxim Group is a small financial firm, with only approximately 350 employees, thus its business affairs are certainly known to, or easily discoverable by, a an officer/director who is a ten year partner in and vice president of the firm.[4]  Decl. ¶ 34.

Kunis' Oath as arbitrator confirmed complete disclosures pursuant to FINRA Rules, which clearly require disclosure of "any ***existing or past financial, business, professional, … or other relationships or circumstances with any party*** … which are likely to affect impartiality or

---

[4] In comparison, MK, itself only a regional firm, had over 4,500 employees.  Decl. ¶ 3.

might reasonably create an appearance of partiality or bias" and "***any such relationship or circumstance involving the arbitrator's … business associates***…". Decl. ¶ 30.  FINRA Rule 12405 put an affirmative duty on Kunis to "***make a reasonable effort to learn of***" and then to "***disclose***" the aforementioned relationships and circumstances.  In particular, relationships between an arbitrator's employer and a brokerage firm party to the arbitration are designated as potential conflicts which must be disclosed. The "Conflicts/ Disclosures" section of the Arbitrator Application specifically asks, "In the last five years, has your employer/firm had a business relationship with any brokerage firms?  Provide details" and reminds arbitrators of their "continuing obligation to update this information." Decl. ¶ 27, Ex. 27 at p.22.

Additionally, the Disclosure Checklist, which arbitrators are required to review and complete before making a decision or attending a hearing, call for this information, asks the following questions, *inter alia*. :

1. Have you had any professional, social or other relationships or interactions with counsel for any of the parties in this arbitration of their law firms?

2. Have you had any professional...relationships or interactions with any of the parties . . . in the arbitration?"

10.B. … has a . . . business associate invested in . . .any of the securities that are the subject of the arbitration?

39. Do you have any other disclosures that are not specifically covered in the above questions?

Decl. ¶ 53. Had Kunis responded with full disclosures to any of the above questions, the relationship between Kunis's firm and MK and its counsel would have been revealed.  Because Kunis answered all of the questions in the negative, no disclosure report was provided to the parties.  *Id.* Further, Kunis did not disclose the relationship with MK and its counsel at any time during the arbitration proceedings.  Decl. ¶ 32.  Had MWCF counsel been aware of any part of

11

the nondisclosed relationship between Kunis's firm and MK and MK's counsel, MWCF would have exercised all of its rights to prevent Kunis from serving on the panel.

>  a.  **Kunis did not disclose that Maxim and MK regularly act as co-underwriters**

A search of equity and debt issuances of Maxim reveals no fewer than 36 issuances wherein Maxim Group was a co-underwriter with MK on multi-million dollar issuances. Decl. ¶ 35. Such numerous joint participation in high dollar issuances evidences a past and ongoing business relationship between Kunis and/or his business associates and a party, MK. This relationship, which creates a reasonable impression of impartiality and bias, was required to be disclosed and was not.

>  b.  **Kunis did not disclose that Maxim and MK were co-defendants**

Kunis' firm and MK have been co-defendants in a number of lawsuits, including lawsuits filed by investors to recover losses in securities underwritten by Maxim and MK.  Decl. ¶ 36. This relationship, which creates a reasonable impression of impartiality and bias, was required to be disclosed and was not. Had MWCF been aware of such information, it would not have permitted Kunis to serve on the Panel and would have exercised its rights to have him removed.

>  c.  **Kunis Failed to Make the Required Disclosure of His Firm's Representation by Opposing Counsel**

Kunis' firm has a past and ongoing attorney-client relationship with MK's counsel in this arbitration, Greenberg Traurig, who serves as underwriters counsel for Kunis' firm. Upon information and belief, and according to a Greenberg Traurig marketing piece, Greenberg Traurig has represented Maxim Group in its capacity as underwriter on at least eight securities issuances (Decl. ¶ 38), including a $60 million IPO of Community Bankers Acquisition Corporation.  Decl. ¶ 37.  This conflict should have been disclosed both by Kunis and counsel for MK. This relationship unquestionably affects impartiality, reasonably creates an appearance

of partiality or bias and is both a violation of FINRA Rule 12405 and cause for vacatur.

           **d.**      **Kunis Failed to Make the Required Disclosure of His Firm's Involvement with the Products at Issue**

The Arbitration was based upon investments in a very specific type of security: credit tranched, asset and mortgaged backed, structured finance securities, which were selected for MWCF by MK and MAM. MWCF's alleged the specific and unusual characteristics of those securities which caused them to be unsuitable for MWCF. Decl. ¶¶ 3, 51 and 52. It was therefore important that the arbitrators disclose whether they had special involvement with or knowledge of the esoteric financial products, which MK itself characterized as a "sub-sub-sector" of fixed income. Decl.¶ 32, Ex.35 at pp. 1259-61, 1329. Yet Kunis, a ten year partner and officer/director and VP of Maxim Group, failed to disclose that his relatively small firm was a manager and/or distribution agent, and received management/underwriting fees from many securities comprising this very sub-sub-sector of fixed income. Indeed, Maxim held these roles on some of the very securities selected for MWCF accounts by MAM and MK. Decl. ¶¶ 40 and 39.

For example, both Maxim Group and sister company, Maxim Advisory LLC ("Maxim Advisory") (both wholly or almost entirely owned by the same parent company) were heavily involved in managing a series of securities, the Jupiter securities, some of which were <u>owned by MWCF</u> through its MK selected investments (Decl. ¶ 39), which constituted the same kinds of toxic investments selected for MWCF's account by MK and MAM which were the subject of the arbitration. On Thursday February 29, 2009, Time Magazine described Jupiter V as follows:

> Unlike a traditional bond, Jupiter's underwriter does not buy people's mortgages, collect the payments and pass them on to its investors. Instead, Jupiter holds other mortgage bonds – and not just any. Jupiter's investments are <u>made up of the riskiest portions of other bonds</u>, some of which are themselves a collection of other poorly rated mortgage bonds. In a rising real estate market, such risks were deemed acceptable. When it was issued in March 2007, 93% of the Jupiter deal was rated AAA. But when things unwind – and have they ever -- any default gets

compounded by the chain of linked bonds. The multiplier effect works like this: while 4.4% of the typical loans tied to Jupiter's bonds are in default, nearly 59% of Jupiter's investments are now worthless. <u>Hello, toxic asset</u>.

Decl.¶. 41 (emphasis added).

Maxim's heavy involvement in the Jupiter securities is exemplified by the term sheet for

Jupiter High Grade CDO III, Ltd., which states:

- Maxim Advisory LLC ("Maxim"), has recently entered the Structured Finance asset management business focusing on Mortgage-backed securities ("MBS"), Asset-backed securities ("ABS"), and Collateralized Debt Obligations ("CDO"). Maxim is a wholly-owned subsidiary of Maxim Partners LLC and is a registered investment advisor under the Investment Advisers Act of 1940

- Maxim intends to become an industry leader in the management of structured finance CDOs.

- Maxim employs investment professionals with extensive backgrounds and experience in Structured Finance. Their portfolio management and credit experience includes investing in the ABS/MBS/CMBS/COO sectors.

- Jupiter High Grade CDO, Maxim's first CDO closed in December of 2004 for $750MM . . . . Jupiter High Grade CDO II, the second CDO advised by Maxim, closed in March 2005 for $1,006.7MM

- Maxim Group LLC ("MG"), a sister affiliate of Maxim Advisory LLC, will provide a wide range of financial expertise and services to enhance Maxim's management capabilities.

- MG will provide support services to Maxim in a variety of areas including operations, systems, control, and risk management. [5]

Decl. ¶. 42.

The prospectus for Jupiter High Grade CDO III, Ltd (Decl.¶ 43) also provides:

Maxim Group is a full-service broker-dealer … The Offered Securities may be offered to … clients of Maxim Group and when sold to such clients, Maxim Group will receive a selling concession. … Maxim Group may receive underwriting fees associated with the distribution of the Offered Securities.

---

[5] "In addition to the services that Maxim Group, LLC provides to Maxim Advisory, LLC, all of the executive officers of the Maxim Advisory, LLC are also executive officers of Maxim Group LLC. Such officers and key professionals spend substantially all of their time in their responsibilities with Maxim Group, LLC and the balance with Maxim Advisory, LLC." Decl. ¶ 43.

Maxim Advisory, supported by Maxim Group, additionally received a portion of the management fees from the Issuer of Jupiter High-Grade CDO V, Ltd., ("Jupiter V") a security primarily secured by Residential Mortgage Backed Securities, CDOs and other Asset-Backed Securities. Decl. ¶¶ 42-44. MWCF owned Jupiter issues, as well as other similar issues such as Lexington Capital Funding and Maxim High Grade CDO in which Maxim was also heavily involved, through investments in the RMK Funds. Decl. ¶¶ 40 and 39. Had Kunis disclosed his firm's involvement in these niche securities[6], and particularly in securities owned by MWCF, MWCF would have exercised all of its rights to prevent his service on the arbitration panel.

## ARGUMENT

**A.   Julavits and Kunis Failed to Make Required Disclosures of Facts that Could Cause a Person to Reasonably Entertain a Doubt about their Impartiality, Requiring Vacatur.**

### 1.      Arbitrators Have a Duty to Disclose to the Parties

Arbitrators "not only must be unbiased but also must avoid even the appearance of bias", and thus must disclose to the parties "any dealings that might create an impression of possible bias". *Commonwealth Coatings Corp. v. Continental Cas. Co.*, 393 U.S. 145, 149 (1968). Specifically, the FINRA rules require a potential arbitrator to disclose "any circumstances which might preclude the arbitrator from rendering an objective and impartial determination .... " Decl. ¶ 27. Through the parties' contracts and the Uniform Submission Agreements, the parties agreed to have their dispute governed by the FINRA Rules. In similar cases involving AAA Rules

---

[6] Additionally, the Arbitrator Disclosure Report expressly requires the arbitrators to disclose "Skills in Controversy" and "Skills in Securities," and panelists are instructed to disclose "expertise derived from your business, securities or employment experience." Decl. ¶ 24. However, Kunis disclosed no expertise in "Structured Products," "Collateralized Debt Obligations (CDOs)," "Collateralized Mortgage Obligations (CMOs)," all of which were categories to check on the form, (Decl. ¶ 24) and did not disclose experience in "credit tranched structured finance," "asset backed securities," (which could have been written in), despite his firm's involvement in many areas of these "niche" securities. Decl. ¶¶ 23 and 39.

courts have found those rules to be incorporated into the parties' arbitration agreement. *Commonwealth Edison Co. v. Gulf Oil Corp.*, 541 F.2d 1263, 1272 (7th Cir. 1976) ("The agreement of the parties to have any arbitration governed by the rules of the AAA incorporate[s] those rules into the agreement.")[7]  As the FINRA Arbitrators' Manual explains: "All arbitrators in securities controversies must qualify as impartial, neutral arbitrators .... *When in doubt, disclosure should be the rule* . ... The arbitrator should disclose any circumstances that might hinder the rendering of an objective determination. The obligation to disclose circumstances that might give rise to a conflict or appearance of conflict is a continuing obligation."  Decl. ¶ 30.

FINRA's rules specify the types of information that must be disclosed, including relationships with the parties or counsel and financial stake in the outcome. This list of topics, however, is not exclusive. Under FINRA Rule 12405, *any* circumstance that might preclude the

---

[7] ;  *See also Varley v. Tarrytown Assocs., Inc.*, 477 F.2d 208, 210 (2d Cir. 1973) ("a clause providing for the settlement of controversies by arbitration pursuant to the rules of the American Arbitration Association . . . is sufficient to incorporate those rules into the agreement"); *Bryson v. Gere*, 268 F. Supp. 2d 46, 52 (D.D.C. 2003) ("Reference to [the AAA] rules in the clause effectively incorporates those rules in their entirety into the Agreement."); *Paley Assocs., Inc. v. Universal Woolens, Inc.*, 446 F. Supp. 212, 214 (S.D.N.Y. 1978) ("Universal cannot argue that [AAA] Rule 24(c) was not binding upon it when it signed the contracts agreeing to be governed by the AAA rules, for 'it is settled doctrine that a reference in a contract to another writing, sufficiently described, incorporates that writing.' . . . This doctrine is applied generally to AAA rules incorporated by reference.") (internal citations omitted).

When the "AAA rules are referenced[,] . . . those rules will govern the proceedings *in toto*. The only exceptions are provisions in the contract which are inconsistent with the AAA rules and which the AAA would view as having a superseding effect." T. Oehmke, *Commercial Arbitration* 149 (1987) (quoted in *RLI Ins. Co. v. Kansa Reinsurance Co., Ltd.*, No. 91-Civ-4319, 1991 WL 243425, at * 3 (S.D.N.Y. Nov. 14, 1991). The Eleventh Circuit has echoed this observation, finding that if the parties reference the AAA Rules, they are incorporated into the arbitration agreement at issue in their entirety unless the parties insert specific provisions in the arbitration agreement taking precedence over the terms of the incorporated AAA Rules. *See Terminix Int'l Co., LP v. Palmer Ranch Ltd. P'ship*, 432 F.3d 1327, 1333 (11th Cir. 2005); *Szuts v. Dean Witter Reynolds, Inc.*, 931 F.2d 830, 831-32 (11th Cir. 1991). *See also Brandon, Jones, Sandall, Zeide, Kohn, Chalal & Musso, P.A. v. MedPartners, Inc.*, 203 F.RD. 677, 684-85 (S.D. Fla. 2001). Courts, including the Eleventh Circuit, have found that unless parties explicitly provide otherwise, reference to the AAA Rules incorporates them in full into the arbitration agreement, and any applicable law that is in conflict with the AAA Rules is essentially preempted by the terms of the Rules. *See Terminix*, 432 F.3d at 1331-33; *Contec Corp. v. Remote Solution Co., Ltd.*, 398 F.3d 205, 208 (2d Cir. 2005). For example, in *Terminix*, the Eleventh Circuit recognized that the question of the validity of an arbitration agreement as opposed to the contract as a whole is generally one for the courts but found that because the parties in question had agreed to conduct arbitration pursuant to the AAA Rules and because the AAA Rules provide that the arbitrator is to resolve the question of arbitrability, the AAA Rules superseded the general rule of law and referred the issue of the validity of the arbitration clause to the arbitrator. *See Terminix*, 432 F.3d at 1331-33. *Accord Contec Corp.*, 398 F.3d at 208.

arbitrator from rendering an objective and impartial decision must be disclosed.

Unlike in judicial proceedings, FINRA arbitrators seldom provide any justification for their rulings, and review of a panel's award is severely curtailed. *See* 9 U.S.C. §10(a).  In an effort to keep the arbitration process free from partiality or corruption, the FAA drafters added subsection 2 to § 10(a). *See* Thomas E. Carbonneau, THE LAW AND PRACTICE OF ARBITRATION 77 (2d ed. 2007) at 124-27 (the purpose of FAA subsection 10(a)(2) is to give courts limited supervisory authority).   It provides that the losing party may protest an arbitration award "[w]here there was evident partiality or corruption in the arbitrators…."  9 U.S.C. § 10(a)(2).

The federal and state judiciary has repeatedly underscored the duty of arbitrators to investigate diligently - and to *disclose fully* - direct and indirect relationships and potential conflicts.  The "requirement for full disclosure by arbitrators is a serious and far-reaching one." *Federal Vending, Inc. v. Steak & Ale of Florida, Inc*., 71 F. Supp. 2d 1245, 1249 (S.D. Fla. 1999). *"*Arbitrators must take steps to ensure that the parties are not misled into believing that no nontrivial conflict exists." *Applied Indus. Materials Corp. v. Ovalar Makine Ticaret Ve Sanayi, A.S*., 492 F.3d 132, 138 (2d Cir. 2007) (evident partiality warranted vacatur of award under the FAA, where arbitrator knew of a potential conflict, but failed to either investigate or disclose). In the seminal case on arbitrator disclosure, the Supreme Court instructed:

> This rule of arbitration and this canon of judicial ethics rest on the premise that any tribunal permitted by law to try cases and controversies not only must be unbiased but also must avoid even the appearance of bias.  We cannot believe that it was the purpose of Congress to authorize litigants to submit their cases and controversies to arbitration boards that might reasonably be thought biased against one litigant and favorable to another.

*Commonwealth*, 393 U.S. at 150.  Further, the Court stated:

> It is true that arbitrators cannot sever all their ties with the business world, since they are not expected to get all of their income from their work deciding cases, but we should, if anything, be even more scrupulous to safeguard the impartiality

of arbitrators than judges, since the former have completely free rein to decide the law as well as the facts and are not subject to appellate review. We can perceive no way in which the effectiveness of the arbitration process will be hampered by <u>the simple requirement that arbitrators disclose to the parties any dealings that might create an impression of possible bias.</u>"

*Id.* at 148-49 (emphasis added).  Justice White's concurring opinion underscores the importance of full, fair and timely disclosure to the arbitration process:

> The arbitration process functions best when an amicable and trusting atmosphere is preserved … This end is best served by establishing an atmosphere of frankness at the outset, through <u>disclosure</u> by the arbitrator of <u>any financial transactions</u> which he <u>has had</u> … with either of the parties. … [i]t is far better that the relationship [between an arbitrator and one of the parties] be <u>disclosed</u> at the outset, when the parties are free to reject the arbitrator or accept him with knowledge of the relationship and continuing faith in his objectivity, than to have the relationship come to light after the arbitration …That role [judging an arbitrator's impartiality] is best consigned to the parties, who are the architects of their own arbitration process …

*Id.* at 151 (White, J. concurring) (emphasis added). When arbitrator impartiality issues are raised, as they are in the case at bar, the district court is required to take a <u>broader and more intrusive review</u> of the award. *See Loveless v. E. Airlines*, 681 F.2d 1272, 1275 (11th Cir. 1982); *Peabody v. Rotan Mosle, Inc.*, 677 F. Supp. 1135, 1138 (M.D. Fla. 1987).

In *Middlesex Mutual Ins. Co. v. Levine*, 675 F.2d 1197, 1200-01 (11th Cir. 1982), the Eleventh Circuit recognized that Congress has imposed upon arbitrators a *heavy* obligation to act out of "strict morality and fairness", and that the Supreme Court's holding in *Commonwealth* is "somewhat analogous to a <u>*per se* rule or irrebuttable presumption requiring the award to be set aside once it is established that the arbitrator actually knew of, yet failed to disclose potentially prejudicial facts which could impair his judgment.</u>" (vacating award based on arbitrator's failure to disclose facts demonstrating "possibility of bias") (emphasis added).  The law is plain that an award <u>should be vacated</u> if an arbitrator fails to make the required disclosure "at the outset, when the parties are free to reject the arbitrator or accept him with knowledge of the relationship."

18

*Commonwealth*, 393 U.S. at 151. *Accord Lozano v. Maryland Casualty Co.*, 850 F.2d 1470, (11th Cir. 1988) *cert. denied*, 489 U.S. 1018 (1989) (arbitrators have an affirmative duty to disclose "any dealings that might create an impression of possible bias"); *Sanko S.S. Co., Ltd. v. Cook Industries, Inc.*, 495 F.2d 1260 (2d Cir. 1973) (failure to disclose business dealings which "might create an impression of possible bias" will void award); *Rogers v. Schering Corporation*, 165 F. Supp. 295, *aff'd* 371 F.2d 266, (3d Cir. 1959), *cert. denied*, 359 U.S. 991 (1959) (vacating award based on arbitration administrator's failure to tell to one party that an arbitrator disclosed that the company in which he was an officer previously did business with the other party).

### 2.      Julavits' Failure to Disclose Prior Litigation as Defendant Requires Vacatur of the Award

Julavits was <u>the defendant</u> in a fraud and breach of fiduciary duty lawsuit in which it was alleged that he, Julavits, <u>breached his fiduciary relationship</u> with the members of the club for which he was a director, <u>made material misrepresentations</u> to them and caused the value of their equity investment to be significantly diminished – <u>the same claims the MWCF arbitrated against MK and MAM</u>. Decl. ¶¶ 33. This information constitutes a circumstance that might preclude Julavits from rendering an objective and impartial determination in an arbitration brought by an investor seeking damages for investment losses and was required to be disclosed.[8]

Evidence partiality requires vacatur of an arbitration award "when either (1) an actual conflict exists, or (2) the arbitrator knows of, but fails to disclose, information which would lead a reasonable person to believe that a potential conflict exists." *Univ. Commons–Urbana, Ltd. v. Universal Constructors Inc.*, 304 F.3d 1331,1339 (11th Cir. 2002) (quoting *Gianelli Money Purchase Plan & Trust v. ADM Investor Servs., Inc.*, 146 F.3d 1309, 1312 (11th Cir. 1998)).

---

[8] Julavits's evident partiality is and failure to disclose was particularly important here because Kunis was a relatively novice arbitrator, having served on only a single panel to award at the time of his selection, and DeWitt evidenced difficulty understanding many of the issues and appeared  to rely on Chairperson Julavits for guidance. Decl. ¶ 56.

"[A]n arbitrator is obligated to disclose those facts that 'create a reasonable impression of partiality' or put another way, 'information which would lead a reasonable person to believe that a potential conflict exists.'" *Id.* (citations omitted). "The party seeking vacatur must point to evidence of an actual conflict of interest or identify a business or other connection that might create a <u>reasonable impression of possible bias</u> that the arbitrator failed to disclose." *Aviles v. Charles Schwab & Co., Inc.*, 435 Fed. Appx. 824, 828-29 (11th Cir. 2011).  However, a party need not show an actual conflict of interest or actual bias in order to establish that grounds for vacatur under 9 U.S.C. § 10(a)(2).  Instead, evident partiality under Section (a)(2) exists where "<u>the arbitrator knows of, but fails to disclose, information which would lead a reasonable person to believe that a potential conflict exists</u>"- that is, where the facts would "<u>create a reasonable impression of partiality</u>." *Univ. Commons–Urbana, Ltd.,* 304 F.3d at 1339  (emphasis added).

The evident partiality standard is met here. Julavits failed to disclose facts that would "lead a reasonable person to believe that a potential conflict exists." *University Commons-Urbana,* 304 F. 3d at 1338. Julavits' prior involvement in litigation alleging substantially similar claims to those alleged by MWCF is "information which would lead a reasonable person to believe that a potential conflict exists." Both MWCF's case and the South Carolina actions involve allegations that misrepresentations and breaches of fiduciary duties resulted in significantly diminished asset values. Julavits' involvement was not remote in time.  In fact, <u>four of the South Carolina actions were still pending when Julavits signed his false disclosure checklist on March 15, 2012</u>.  Julavits having recently been accused of breaching his own duties of loyalty and trust, regardless of the claims' validity, would give any objective observer a reason to doubt Julavits' impartiality here.  Julavits' litigation history would give any reasonable person the impression of "possible bias" or "potential conflict," and is required to be disclosed by FINRA

Rules and the ABA Code of Ethics for Arbitrations. Such a disclosure would have caused MWCF to strike Julavits or seek his removal for cause after appointment.

Any attempt by MK to argue the failure to disclose similarly situated litigation is disingenuous. In *Hagman v. Citigroup Global Markets, Inc.* (Cal. Feb. 9, 2011) No. BS128800, 2011 WL 975535 (cited at 12 AA 2776-77), MK's counsel in the MWCF Arbitration (specifically Terry Weiss of Greenberg Traurig) made almost identical arguments in the motion to vacate the award. There, one of the arbitrators failed to disclose that he had been a plaintiff several years earlier in both a bankruptcy case and a real-estate related case. Someone else had purchased properties with the funds supplied by the arbitrator but failed to properly transfer the properties and used partnership funds for their own use. The arbitrator asserted claims for breach of fiduciary duty in bankruptcy court, which found in their favor. The *Hagman* claims involved securities, not real estate, and alleged that Citigroup purchased unsuitable securities and sold Hagman an unsuitable life insurance policy. Notwithstanding these differences, the court vacated the award , finding the cases similar enough to require disclosure, as both involved "breach of fiduciary duty and mismanagement of an investment," thus creating an appearance of partiality. *Id.* at Decl. ¶ 46 and 47.[9]

Additionally, <u>in this case</u>, MK successfully sought the removal of an arbitrator (Mr. Mond) based a failure to disclose similar litigation, stating:

> The basis of the removal is straightforward:
>
> > • He cannot reasonably be expected to serve in an impartial manner given that he is currently suing a brokerage firm for allegedly engaging in virtually identical conduct that is at issue in this case;
> >
> > • He never voluntarily disclosed the existence of this matter that has been

---

[9] Further evidencing MK's counsel's belief that the grounds asserted here warrant vacatur, Mr. Weiss has also made these same arguments to the Eleventh Circuit in *Rosen Capital Partners v. Merrill Lynch Professional Clearing*, No. B132957. Decl. ¶ 48. As far as MWCF is able to tell, that case has not been resolved.

> pending for many months, that is until MK innocently asked all of the arbitrators to update their disclosures; and
>
> • Even still, the minimal disclosure he eventually made omitted the key facts that would have been important to have disclosed making the disclosure misleading.
>
> The circumstances surrounding the woefully deficient and untimely disclosure of Mr. Mond's lawsuit create a reasonable impression of bias by Mr. Mond. He must be removed from the Panel and replaced.

Decl. at ¶ 9. Thus, MK has admitted that litigation like that which Julavits was involved in creates a reasonable impression of bias and evident partiality, and MK should be estopped from arguing otherwise.

> **3.** **Kunis' Firm's Extensive Relationships to the Parties and Their Counsel, as well as His Firm's Involvement with the Products at Issue in the Underlying Arbitration, Warrant Vacatur**

Arbitrators must make "reasonable efforts" to inform themselves of relationships and interests that "might reasonably affect impartiality or lack of independence in the eyes of any of the parties." ABA Code of Ethics for Arbitrators in Commercial Disputes, Canon II (A)(2). Once this is done, disclosures must be made when, "in the eyes of the parties," there is an interest or relationship that might affect the independence or raise concerns about partiality. *Id.* Further, as Justice White noted in *Commonwealth*, "where the arbitrator has a substantial interest in a firm which has done more than trivial business with a party, that fact must be disclosed." 393 U.S. at 151-152 (emphasis added)  Here, Kunis, an officer/director, VP and partner of Maxim Group has a substantial interest in a firm that has done more than trivial business with MK.

In *Olson v. Merrill Lynch, Pierce, Fenner & Smith*, 51 F.3d 157, 159–60 (8th Cir.1995), a panel of three arbitrators decided in favor of Merrill Lynch and Putnam. Olson later learned two of the arbitrators failed to disclose that their employers had ongoing business relationships with Merrill Lynch and that their employers used the same law firm as Merrill Lynch.  While one

arbitrator disclosed the name of the investment firm for which he worked, he did not reveal that his firm did a substantial amount of business with one of the parties to the arbitration, Merrill Lynch.  Much like the relationship between Maxim and MK, in *Olson* the arbitrator's firm managed 17 bond issues where Merrill Lynch served as a joint underwriter.  Olson moved to vacate the arbitration decision under 9 U.S.C. § 10(a)(2) arguing the nondisclosure showed evident partiality in the arbitrators. The court vacated the award, holding that the arbitrator "was required to disclose the business relationship . . . [even though] he was not personally involved in bond deals or in selecting other securities firms to participate in syndicates, [the arbitrator] had a substantial interest in [his firm] as a high ranking officer, and [his firm] did more than trivial business with Merrill Lynch." *Id.* at 159. The court noted that disclosure of "even indirect ties" will aid the arbitration process, and holding that the arbitrator was under a duty to disclose business relationships between his firm and the party.  *Id.* at 160.  *See also Applied Indus. Materials Corp. v. Ovalar Makine Ticaret Ve Sanayi, A.S.*, 492 F.3d 132, 138-39 (2d Cir. 2007) (award properly vacated for nondisclosure where arbitrator knew of discussions between his company and a company which was purchasing one of the parties, but because "arbitrator believed in good faith that because the potential transaction involved a subsidiary, would generate revenue that was small in light of the size of his business, and was far removed from his daily concerns, nothing had occurred that would affect his ability to be fair and impartial" did not investigate it further and accordingly made incomplete disclosures of their business dealings).

Here where Kunis' firm was involved in at least 33 underwriting deals with MK, was represented numerous times by counsel for MK, had been co-defendants with MK numerous time, and issued and distributed the same types of securities that MK and MAM packed and distributed to the MWCF in this case there can be no doubt that these relationships rise to the

23

level of actual conflict.  The fact that Kunis' firm's affliate put together the very type of deals that MWCF claimed were "toxic" and a "tangled hairball of risk" and Kunis' firm then distributed those same risky assets to its clients – conduct which formed the basis of MWCF's claims against MK and MAM, would lead a reasonable person to believe that a potential conflict exists. For these same reasons, Kunis' failures to disclose his firm's relationship with MK warrant vacatur.

### 4.    The Failures to Disclose Deprived MWCF of its Preemptory Strikes

Julavis and Kunis' failures to disclose deprived MWCF of an opportunity to meaningfully exercise the preemptory strikes afforded to it in the arbitrator selection process.  *Rogers v. Schering Corp.*, 165 F. Supp. 295, 301 (D.N.J. 1958) aff'd, 271 F.2d 266 (3d Cir. 1959) (failure "to communicate to the parties information disclosed by a prospective arbitrator bearing upon circumstances likely to create a presumption of bias, and the consequent prevention of the party to proffer a timely objection based upon that information, is more than a loose procedural informality. It goes to the heart of a body designed to resolve controversy— its integrity. In this instance it fails to protect what might be termed 'due arbitration process.'")

It is a black-letter law that, in a jury trial, prejudice will be presumed and a party need not make a showing of prejudice if the party's right to exercise a peremptory strike has been impaired. *See Knox v. Collins*, 928 F.2d 657, 661 (5th Cir. 1991) (impairment of right to peremptory strikes of jurors is reversible error without a showing of prejudice); *United States v. Mosely*, 810 F.2d 93, 96 (6th Cir. 1987) (no showing of prejudice required when right to peremptory strike of juror is denied). This principle is equally applicable in arbitration with regard to arbitrator selection, as a party in arbitration must be ensured the meaningful and reasonably intelligent exercise of peremptory strikes against potential arbitrators who act as both judge and jury. A party cannot meaningfully exercise its peremptory strikes if FINRA's

disclosure requirements are not met. Complete disclosure and communication is the key to the selection of an impartial and non-biased arbitration panel, just as *voir dire* and the availability of peremptory strikes are essential to the selection of an impartial and nonbiased jury.

In this case, MWCF's right to exercise its peremptory strikes in a meaningful and intelligent manner was impaired and obstructed by the arbitrators' failures to disclose. As with the defendant in *Knox*, *supra*, this failure to disclose rendered counsel for MWCF unable to exercise its peremptory strikes in an informed manner and resulted in permitting arbitrators to remain on the panel who would have been struck had the full panoply of facts been disclosed.  In short, Julavis and Kunis' nondisclosure denied MWCF full and fair use of its peremptory strikes.

**5.     MWCF Had No Duty to Investigate the Truthfulness of the Disclosures**

MWCF had no duty investigate the veracity and completeness of Julavits' or Kunis' disclosures. The law is clear that parties may trust that potential arbitrators have made the required disclosures and have no duty to investigate whether a would-be panel member has provided an incomplete, incorrect or misleading disclosure because the burden is on the arbitrator to disclose.  *See Middlesex Mut.*, 675 F.2d at 1204 (holding that district court properly vacated arbitration award based on evident arbitrator partiality).  As the Eleventh Circuit held:

> "By positing that appellants have the duty to inquire into the background of the arbitrator, appellant attempts to shift to the parties  . . . the burden of determining and disclosing bias or the reasonable appearance thereof. Neither federal nor Florida law supports such a result.... [F]or the arbitration process to work successfully, the onus must be placed on the arbitrator to reveal potential bias

*Id*.

<u>**CONCLUSION**</u>

Based upon the foregoing law and facts, MWCF respectfully requests that the Court enter an order (a) staying the enforcement of the award until the resolution of this Motion; (b) vacating the award; and (c) granting such other relief as the Court deems proper.

Respectfully submitted this the 4th day of September, 2012.

/s/ Page A. Poerschke
Page A. Poerschke
One of the Attorneys for Respondent
Municipal Workers Compensation Fund, Inc.

**OF COUNSEL:**

Page A. Poerschke
Laura S. Dunning
Rebecca A. Beers
**HASKELL SLAUGHTER
YOUNG & REDIKER, LLC**
2001 Park Place, Suite 1400
Birmingham, AL 35203
pap@hsy.com
lsd@hsy.com

Peter J. Mougey
**LEVIN PAPANTONIO THOMAS MITCHELL
RAFFERTY & PROCTOR, P.A.**
316 South Baylen Street, Suite 600
Pensacola, FL 32502-5996
pmougey@levinlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing pleading upon all counsel of record via the Court's CM/ECF electronic filing system this the 4th day of September, 2012. Under 9 U.S.C. §12, this Motion was served on MK's attorneys within three months after the arbitration panel issued the award.

Peter S. Fruin
Donald F. Winningham III
Maynard Cooper & Gale, P.C.
109 Sixth Avenue, Suite 2400
Regions/Harbert Plaza
Birmingham, AL 35203
pfruin@maynardcooper.com
dwinningham@maynardcooper.com

Terry Weiss, Esq.
George Sullivan, Esq.
Greenberg Traurig, LLP
Terminus 200, 333 Piedmont Road NE, Suite 2500
Atlanta GA  30305

*/s/ Rebecca A. Beers*
OF COUNSEL